This is the first day of a four-day sitting by this panel. I also want to welcome, for the first time sitting with Fifth Circuit, District Judge Jeremy Canoto, who comes here from Tyler, Texas. Very glad he could join us and help out on on our caseload. District Judge is sitting with us as a practice that we did a fair amount when I first got on the court, which was not recent, and then we sort of dropped, but I'm glad we are doing it again. They add so much to our understanding of the cases, so welcome, Judge Canoto. Welcome to all of you as well. Our first case of the day, United States v. Kenneth Ritchey. Looks like Mr.  This court should reverse the sentence imposed by the District Court and remand for a re-sentencing with direction to the District Court to credit the fair market value against loss of the full amount paid by the buyers for the PPE at issue. In light of the substantial guideline change that that would result in, going from 57 to 60 months to 4 months to 10 months, this court should also direct the District Court to reconsider the 3553A factors before it determines whether or not it would actually impose a 60-month sentence. Your Honor, the court calculated the fair market value in a way that was not legally acceptable. The court also made some clear error in some of its factual findings that it used to support both its calculation and its imposition of the statutory maximum sentence. The court was required to consider fair market value by focusing on the, quote, most economically rational analysis of the sale. That comes from the State of Jameson, which is a Fifth Circuit case. To that end, the court is directed not to consider the intent of the actual seller or buyer. The buyer and seller are each to be considered hypothetical and not actual persons, and each is to be considered a rational economic actor. That is, each is seeking to maximize his advantage in the context of the market that exists at the date of the valuation. I would note at this point that the government's proffered expert, who did not testify at sentencing, Dr. Shippen, himself calculated the cost, average cost paid per mask by the appellant and his company at $7.61 per mask. Now, that's the cost to the appellant and his company, and calculated the — JUSTICE KENNEDY. Excuse me, Counselor. Didn't the PSR take that concept, if not the actual dollar amount, into consideration and expressly said, I'm not going to consider the cost of what someone who's going to be engaging in this kind of price gouging had himself to pay to begin his illegal enterprise? If that's correct, I mean, tell me if it's not, and if so, what do you make of that? MR. SHIPPEN. That is correct, Your Honor. It is a misapplication of the standard that was set in the Jamison case by this Court, where the Court has specifically said when you undertake this economic analysis, you have to not consider the intent of either the buyer or the seller. This is a strict economic approach, and that's dictated because the sentencing commission chose to use the phrase, fair market value, in this particular provision of the guidelines. JUSTICE KENNEDY. How much of this is based — is really going to be affected by our standard of review? Judge Osherden had this in front of him. He had Shippley, if that's his name, his expert, he had yours, and looking at the right way to make these calculations, we're going to have to say that Judge Osherden made clear error in choosing the way to make this calculation? MR. SHIPPEN. I don't — I do not think you have to say he made clear error in this calculation. I think it's sufficient to say that the Court simply didn't apply the fair market value analysis in the way that this Court has directed that he should have done or that any Court should do, and that his method was not legally acceptable. He simply needs to go back and apply a strictly economic approach without overemphasizing his role as fact finder. I mean, listen, the case in and of itself is not one that lends itself to a great deal of sympathy on its face, but what the Court needs to understand here is that the facts are facts, and the appellant is entitled to the positive inferences inasmuch as he's accountable for the negative ones. And so the government's position in the PSR was, is that, look, we can't carry out this analysis essentially the way the Court has directed us to do because that would thwart law enforcement's ability to prosecute and remedy price-gouging cases. And that is, from a practical perspective, an understandable perspective, but it is not one that can drive a guideline calculation, an end-result sort of methodology. That's the problem I'm having with your argument. I understand your fair market value point, which is a good one, but how do you square that with what the defendant pled guilty to? He sold PPE at inflated prices in excess of prevailing market prices. So your position is at zero. The loss is zero, right? Then what did he plead guilty to? So it gets clunky, Your Honor. The concept of prevailing market price, as explained by Dr. Noel and as confirmed in the case law that the Court relied on in ruling on a previous motion, makes it clear that the concept of prevailing market price is not an economic concept. It is a uniquely legal concept that revolves around the price previously charged for an item and then the price charged once the Defense Production Act kicks in and says this is a scarce item. That is not synonymous with the concept of fair market value. Dr. Noel explained, and the government's expert did not dispute, that fair market value has nothing to do whatsoever with a previous price point. And so while it creates certainly a conundrum and it creates a disincentive for emergency wholesalers to do what was done in this case, which did provide a service, although you could characterize it as doing a right thing in a wrong way from a legal perspective, it disincentivizes that. But those are two separate and distinct concepts. And so when we fashion the factual basis, which we did jointly with the government, we were very careful not to agree at all to any representation that Mr. Ritchie knowingly charged in excess of fair market value for anything. You'll note in the factual basis that it says Mr. Ritchie conspired to charge prices above prevailing market price. Now, in the factual basis, it then said hereafter excessive prices. And so when you see the term excessive prices in the factual basis, it refers back to that phrase prevailing market price. What was the prevailing market price? Is that in the record? Your Honor, the prevailing market price in this case was calculated essentially by the probation offices being what the three M company charged for their masks under their government contract. That is, of course, not particularly relevant to the market, the secondary market that the appellant and his company were in. They were these air wildly different markets. The three M company had a contract with the government to provide a certain number of masks at a certain price that existed well before the pandemic and the contract extended into the pandemic. I would note that three M chose not to increase production and whether it could not or would not, I don't know, but did not increase production to fund to try and provide what was needed and continued to sell only what it was obligated to manufacture and sell at those low prices. Dr. Noel explained that large companies like three M many times would choose to sell their products below fair market value to engender goodwill for its larger line of more profitable products. Now again, that's speculation as to why they did or didn't do increase their production to try to meet the demand here, but it left a need and it's a need that the PSR and the regardless of the pricing, these 219 or so secondary wholesalers like the appellant's company that went and found mask at places where V. A. Buyers or hospital buyers aren't going to go and find them and be able to get them and brought them to market, brought them to their doorstep immediately. Well, that's a service. And so what I mean when I say the appellant is, you know, as facially sort of offensive as this is, there is the fact and it's an indisputable fact that all of these emergency wholesalers actually serve this need. Now, if they did it in a wrong way, he's played guilty for that and he's not aggrieved by his plea. He's happy with his plea. He is as expressed in his Alex to follow up on that and also to follow up on Judge Cronodel's question. I think your position is correct me if I'm wrong, is that there is a sufficient factual basis for his guilty plea to defrauding the government. Yes, your honor. And yet in your view, the actual loss to I guess the V. A. Is zero. Okay. Is that is that right? That's correct, your honor. And I understand, you know, now let me be clear. I'm not asking the quarter suggestion that the court would come down with some broad sweeping rule that this is the case and you know, zero losses that is unique to this particular case. It is not unique to government fraud cases. Um, just so you know, this is the first time I've been before this court on this side of the room. I've been on this side plenty of times. And some of those cases were S. B. A. Cases. This court may be familiar with judge as a district judge where you come in with an S. B. A. Fraud case and the loss is zero because the S. B. A. Had the loan collateralized and chose not to follow up on the collateral. That defendant committed a crime. There was a sufficient factual basis, but because of the way the guidelines are written by the Sentencing Commission and acquiesced to by Congress, the court is compelled to calculate a zero loss because of those factors. Well, this is the same concept. There was value provided to each of the buyers. So to follow up on that, I understand the sentencing guidelines say that you get a credit for fair market value. I mean, that's, that's really, I really don't care about the, it looks bad or it was a bad, this is a sentencing guideline case. So in your view, did the district judge simply fail to give any credit whatsoever for the fair market value of the PPE or the masks? So he gave none. No, he did some, he gave, there was a reduction. The reduction was based on the prices that the probation office calculated using three M pricing, which is a different market and not really a pre pandemic pre pandemic. So they use some probably different market. I'm sorry, you're on a totally different market, a totally different market pre pandemic. And so there was a credit given, which is also, I think, an important point. The district court did recognize that a credit for fair market value needed to be given. And that issue is not on appeal from the government. So I mean, that's, that's something that we have, you know, in the case here, but they did give a credit. It was a credit based on different pricing in a different market. And I think in your view, okay. In your view, the credit given was based purely on pre pandemic prices. No, sir. I think it was a combination of combination. Okay. Is what the precedent report did, but what it did was it took just three M pricing and essentially the position that the, that the pre sentence report writer took. And I get it. It's, it's humanly intuitive. It's not an economic approach is that, look, how can you sell a mass for $20 at three M can sell for 50 cents or 60 cents or $3 and 25 cents. And Dr. Noel explained that. Uh, and so, you know, it's just sort of an uncomfortable thing, I guess, from that perspective, but, but like you said, it's a guideline case, your honor. And so what the guidelines requires for the court to sort of faithfully apply this economic approach. And so, uh, it's important to note that the government never offered it. The government's expert never offered an analysis of what the fair market value was. This came strictly from our precedent support writer and a probation officer who had a ton of information and had to come up with some calculation and listen in their own words, their calculation was never going to recognize a significant decrease. I mean, this is in the pre sentence report. We cannot do it this way because it would thwart law enforcement. And that's really antithetical to the purpose of the guidelines and the way they're supposed to be applied. Um, and so that that is, is particularly troubling. I mean, when you look at so that we're not sort of in the realm of economic theory, can you put a rough dollar value on this? I mean, so there, there's a total loss is calculated at 2.3 million and change. Um, there was a fair market value credit given of what dollars and what do you think it should have been about 200. Um, the fair market credit was about, I'd have to go back to the brief. I think it's about, uh, it was close to a hundred. It was, uh, I think maybe a hundred thousand ish dollars, your honor. It was a small, the loss amount was a little over point something million afterward. Uh, and so it was a small amount. Our position is, is because of the way the markets work and because of the way Dr. Noel explained this is that it should be the amount that was actually paid. So in this particular case that would wash out to zero. Now, I mean what he was selling masks, masks, um, and some other non mass PPE. And what was he selling the mass for? It varied over a course of time, but it would want to what the high water. I mean, just the high water mark was at the very end of this. And this was only occurred in a 60 day period, but the high water market, the very end was like $25 a mask. Okay. But in your view, that was fair market value for the mask. If you apply the strictly economic approach of what fair market value means in that context, then yes, in this case, in that moment, it would be, if you look at what a rational buyer and seller placing their appropriate values on the property would place on it in the moment, then, then yes, I think you have to stay true to that analysis. But, uh, and I hate splitting babies, your honor, but I would point you, I would point you though, to split hairs that to your honor. But, but listen, I would, I would say that, that we all recognize that the court doesn't have to hit this nail right on the head, right? The law does not require in terms of the credit, uh, for, for overall laws calculation, right? So the court has to faithfully apply each of these, you know, and correctly, rather not only faith limit, I don't mean what that implies correctly, uh, calculate these things and follow the paradigm that this court has established. But the overall rule for sentencing does give the court some latitude, right? A reasonable estimate of loss. And so what I would suggest to the court is if this court starts to struggle with the notion that these very high end points might not be reflective of fair market value, just look at the government's experts calculation, $7 and 61 cents per mask cost to, to Gulf coast, to the appellant. And then an average sales price over the 60 day period of $15 and 94 cents per mask. Now that's a, that's going to give you like 101% markup, which as Dr. Noel explained about some other types of goods, uh, is not very high at all. Uh, so if you even were to say, look, we think that that's the high watermark $15 and 94 cents per mask, which I'm not advocating. We are not abandoning our position on this at all. I'm simply suggesting that if there is leeway to be given, I would suggest that that's probably as low as, as the mark should go. Uh, and that's giving the government the benefit of their experts opinion in that regard. So, uh, to the extent the court may, may struggle with the 20 and $25, there is some, some factual basis here to, to move a little bit. If you're applying this, the notion of a reasonable estimate, you said this was a unique circumstance in a price gouging case and that the fair market value is zero. Why would that, it seems like it would happen in most price gouging cases. Well, you know, the first thing I would, I would point out to the court is there's really not a per se, a federal price gouging law. Like you can't go through the code and find a price gouging statute. What you find is the defense production act, which is take several steps to trigger, uh, but to, to directly. So I don't know that it'll come up very often in a federal context. This is more of a state law, a sort of concept where you have these individual laws. But I think in this particular case, he was asked, Dr. Noel was asked on cross examination, Dr. Noel, is that your position that it would always be zero? And he said, no, it's not. He said, this is the case that I've looked at and I'm giving you my opinion here. If you want to suggest to me a separate set of facts, this is Dr. Noel, uh, a separate set of facts, then I would give you an opinion. And so I think quite possibly there would be a circumstance where you had something that wasn't fair market value. For example, if you had real compulsion to buy a product at a certain price, a court order, uh, or something that might fit that blacks law dictionary definition we cited on compulsion. And as I'm finishing here, I just want to mention, you know, there are plenty of examples of things that we have to have in life, housing, food, shelter. That doesn't mean that a house isn't fair market value or food isn't fair market value just because we have to have it to live. And that's sort of the same circumstance we're in here. Just because these were critical medical supplies doesn't mean that they were compelled to the point of rendering this not fair market value. And I'm sorry, I've exceeded my time. One question and then your time really is up. Is there any relevance to the Mississippi law? It's cited in one brief on price gouging. Your Honor, there's not. That's a different statute. And the defendant did, or the appellate did plead guilty to that in state court. It is for the same conduct. Okay. But as far as figuring out where the offense lies, the kinds of arguments you're making now, there's no Mississippi law component of that. Well, I'm sorry, Your Honor, I didn't understand. Is there any Mississippi law component? Oh, no, Your Honor. There's not a state law component that would inform this court's fair market value analysis. Thank you. May it please the Court. Jeremy Sanders on behalf of the United States. Your Honor's defendant, Ritchie's 60-month sentence for conspiracy to defraud the United States should be affirmed for three reasons. First, the district court correctly determined that Ritchie's expert's determinations as to fair market value were incomparable with the legal definition of that term. Second, the district court correctly determined that Ritchie's zero-loss argument, which he continues to press in this court, is fundamentally inconsistent with the factual basis underlying his guilty plea. And third, even assuming there was any error in the district court's loss calculation, such an error would be harmless based on the district court's clear and definitive statement that it would have imposed the same sentence based on the 3553A factors. Happy to answer any of the court's questions as to any of the issues, but to start with the first point, the Supreme Court and this court has defined fair market value as the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of the facts. That's from the Cartwright case, but also as recently as earlier this month, the Supreme Court in Connolly v. United States reiterated that definition. I believe this is in the PSR. Correct me if I'm wrong. I found it odd they quoted something from a Cornell Law School legal site that you can access through Google and non-lawyers can figure out what the law means. I was hoping we might rely on better things. The definition seems different than what U.S. v. Cartwright says, which the PSR also refers to. According to Cornell, fair market value is what an informed and unpressured buyer would pay to an informed, unpressured seller in an off-linked transaction fully aware of all the facts of the situation. Isn't that adding a little bit to unpressured? The pressure of what was going on at the time is obvious, and the need to find what was unavailable largely in other places was as obvious. The idea that you're looking at unpressured value, which tends to send you back to pre-pandemic prices, seems wrong. What's your reaction? I understand you are correct that the PSR did refer to this Cornell Law definition but also referred to the Cartwright standard. I would note that the district court was very clear when it announced its ruling that it was basing its definition on the Supreme Court and this Court's determination of what the fair market value definition is. It did not adopt the pressure discussion that the Cornell definition had. It followed Cartwright. It followed those other decisions. Wasn't the effect, though, of what the government was arguing is to ignore what may have arguably been, certainly the argument made by your friend on the other side, that there was a different market at the time of the pandemic. They were not in a position from buying from 3M under government contracts long in existence. They went to big box stores that sell to home products for their sawing at home, eBay, other such places. Wasn't Ritchie's group providing a service unavailable to the VA itself and providing masks immediately that would not have been available at the prices 3M would have charged? Well, granted, 3M did not raise their prices during the pandemic. But they also weren't able to provide immediate masks. That's correct. Ritchie was. So isn't that a different market? It is a different market. I gather, I mean, I credit the District Court's opinion that it was not a normal market, which is why Dr. Noll's opinion, it rejected, is unreliable and uncredible and not helpful to the analysis. I think the two key points to stress here is that those two of those clauses from the definition of fair market value, one is that there was no compulsion. Well, certainly there was compulsion here. In fact, one VA buyer said that they had them over a barrel. And the second point is that purchasers did not have reasonable knowledge of all the relevant facts. Well, that just means, I mean, he pled guilty. And whether we accept a zero loss or not is an entirely different question. But he pled guilty to having violated law by what he did. The only question to me is how much did he gouge the government? And so, Seema, your answer isn't, because I didn't present the question that way, isn't really responsive to that. It does seem to me at least an argument that the value that he should at least be given as to a reasonable price for what he's charging is not the 3M price. Well, I think this Court has never demanded that loss be determined with any precision. It's only a reasonable estimate. Now, this method may not be perfect, but it's certainly reasonable. And when it's compared to what the defendant is stressing— It's reasonable if it's what a long-term wholesaler, I guess is the right way to refer to him, price, compared to someone who has to buy through retail stores and then sell at a profit for himself. It seems to me arguably not a reasonable calculation. Well, that — what Your Honor is positing is a different metric against which to — than the 3M prices. But what the defendant has been stressing is a zero loss argument altogether, that everything — every mass they sold at every price was the fair market value. And that's simply inconsistent with the factual basis underlying his plea. Are you splitting hairs with me? No. It's not babies' hairs. I'm not really adopting his viewpoint. All I'm trying to say is there may be something between what he would like us to do and what Judge Olsherdin did. And I don't know if that's true or not. Judge Olsherdin may have been exactly correct. But I am concerned and maybe I just need to let you give the rest of your argument as to why — I mean, what you're basically saying, the business model for this company, for Richie and his company, is always going to run up into a violation of this statute because it's going to be a — to make any kind of profit at all, it's going to have to charge a lot more because they're buying retail. And so their pricing is always going to be skewed from what the government says is the proper pricing. I don't disagree with that. I think that that's fundamentally what he pleaded guilty to and what the criminal offense here is, that he agreed that he sold it at inflated prices in excess of prevailing market price. Now, the Fed — Are you saying that this, in a pandemic or another emergency, it will almost always be — well, it's going to be against the law to buy at retail prices, make products immediately available and go to somebody like VA and sell them at a higher price than would be available ultimately from their usual supplier? I think if you agreed, as the defendant did, that you did it in a way to impair, instruct or impede the lawful functions of the VA by acquiring prices at fair and reasonable values, yes, that would be a violation of the conspiracy to defraud the United States, the Klein conspiracy. So I take all that as a given because he pled guilty. And we're here on a sentencing issue. And we all agree that he deserves a credit for the fair market value of the masks that he sold. That's correct. We agree with that. What I was asking earlier — I'm not — I guess maybe I should be more interested in economics, but I'm not. So I mean, we can talk about the hypothetical sort of concept of fair market value, OK. But when we get down to the numbers, it seems pretty obvious to me that — tell me if you'd agree with this. If fair market value were calculated purely based on pre-pandemic prices for masks, only that, wouldn't that be an error? I think it could still be a reasonable calculation if that was all the available evidence that there was in the record. Yeah, but I mean, we all know there was a pandemic. We know that there was, I guess, a different market, meaning a huge increase in supply — in demand for masks, and not a corresponding increase in supply or one that could keep up with it. So that's a different market. So it would seem to me — and tell me if I'm wrong, again, I'm not an economist — it seems to me it would be wrong to say we're going to calculate fair market value of a mask based on what was happening before the pandemic, as opposed to at least some taking into account some period of time within the pandemic. Well, I want to be clear, as my friend on the other side conceded, they did — the prices were not just before the pandemic, but also during the pandemic. Okay. So what — so I guess then that gets to the point, which is my understanding is — again, correct me if I'm wrong — is that we're here sort of on clear error review to see if the calculation of fair market value is clearly erroneous. That's right. Okay. That's what I thought. So tell me about this calculation of fair market value and why you don't think it was clearly erroneous, given that it did include some pre-pandemic pricing. It also gave a number of benefits to the defendant. Okay. And several — there was not available information about certain costs for non-N95 mask PPE, and the PSR credit of 50 percent — 56 percent offset to the defendant, which it said is far in advance of what we think the prevailing, you know, offset would be in urge to his benefit. It also didn't account for — they did not credit as part of the loss calculation the cost of non-masks PPE for — that were sold to non-VA hospitals. So there are several built into the analysis that credit — that are in urge to the defendant's benefit.  So there — But does that go to a calculation of fair market value of what he sold? It just goes to all of a piece that this was a reasonable estimate that was given based on the available information that was before the district court. But if I might be able to turn to my third point, which is simply the easiest way for this court to dispose of this case is simply to take Judge Ozerden at his word that regardless of any — if there had been any calculation, error in the calculation, he would have imposed the same 60-month sentence for these same reasons as the — as the court indicated in its analysis of the 3553A factors. And I think it's important to say that's the Guzman-Rendon case that sets out that two-part standard. And the court specifically said — If we were to go with you on that path — and I agree, that makes appellate courts' jobs easier if you can do that. Do we still have to consider whether there was a really bad error in fair market value of the PPE? No, I don't think — We don't? Because if he made a really super bad error, then he might not have had a basis for saying 60 months. It would have been — I think the argument is, is that it would — if he really, really made a bad mistake on — and I'm not saying he did — but then he would have had to essentially vary way up to get to 60 months. It would have been an upward variance. I don't dispute — my friend on the other side is correct — that if you bought the zero-loss argument, it would be a much lower guidelines range. But that — what the court said in Castro-Alfonso is that you take the district court at its word. Now, Judge Ozerton had said this. There's no indication that he didn't mean it. And he was very clear with some of the statements he made in his 3553A analysis. This was a very serious offense. This was a life-or-death situation. It showed a lack of respect for the law, particularly in the time of a pandemic when there were very serious health threats faced by the public and medical providers. And so there's no indication that the district court wouldn't have given the same sentence, even if it was a large upward variance. Let me ask you, counsel, back on whether there was error at all. In the PSR, to calculate fair market value, this rioter, PSR, focused on what these facilities reported they had paid for these items pre- and post-pandemic. Are you asserting that what then comes in here is — takes into account post-pandemic prices? It does — It's not clear to me what's the pre- and what's the post, but that's the introduction to the prices that follow. So you're asserting that the PSR was prepared by the probation office by getting figures from the VA? The VA. As to what they were paying during the pandemic from what they thought were more legitimate providers, suppliers. And that's where the $3 and change price comes up for the N95 mask. The various charts that they have about the price paid aren't broken out, I don't can't tell which ones were pre and which ones were post, they're just sort of averages. There's no dating on here that I can see. That's right. All right. So that's not — but you're assuring me, at least according to the PSR rioter, that these include pandemic prices? I think we — I take the PSR sort of at its word that at the beginning of the introduction it says it encompasses for pre- and post-pandemic. We know that 3M didn't raise its prices during the pandemic, so that's why you might not see a large differential change, at least with respect to that supplier. Well, you were representing the government. Let me ask you something as an officer of the court. Are you aware of any case law in the Fifth Circuit that has overridden a statement by a district judge that I would have given the same sentence? I am not, but I certainly couldn't swear that there isn't one out there. Tell me you're not aware of one. I'm not. Well, I'm asking. That's all I'm asking. Okay. All right. You can proceed or give us back your time, either way. I'll follow up on one of these questions. So is there — it was a little unclear to me, all these numbers and what exactly the PSR rioter used, but is there an average price for the PPE that was bought and sold during the pandemic in this region, other than what the defendant sold it for? No, because there's — as you are correct, the PSR has a lot of numbers in there that's average prices of what the VA bought, average prices of what other private hospitals bought, average prices at what was sold. So I don't think it's easy to pinpoint, like, a precise number, no. And wouldn't the most accurate fair market value be what another seller was selling the PPE for during the relevant time period in this particular region? And I think that's why they took the 3M's pricing. They weren't going to credit GCPPs, because it was engaged in the hoarding and manipulative selling practices. All right. There are no other questions. We rest the arguments on our brief, and we'd ask the Court to affirm the sentence. Thank you. May it please the Court, Your Honor. Your Honor, to go back to your question that I was unable to answer before, and I apologize for that, the total credit against loss that was given, combining the private hospitals and the VA, was $218,917.79, which left a total loss amount of $2,328,347.14. So, I mean, he gave, that's the credit of $200,000 and change. That ought to, I mean, that should represent the fair market value of the masks that were sold, if that's what you're saying. That was the Court's determination. That was the Court's. Your argument, just to be clear, your argument is that that should have been $2.3 million higher. Yes, Your Honor. That is our argument. Now, I want to go just to a few things in my remaining time. Just to be abundantly clear, the only pricing data that the PSR relied on was 3M price data. Their prices were contractually obligated, so they did not change pre-pandemic and during the pandemic. So, using 3M prices during the pandemic is just the same as using 3M prices pre-pandemic. The PSR did— Going beyond, the writer of the PSR said he or she was using, during pandemic prices, you said it was just 60-day period, whatever that period was. Are you challenging that or are you just refining what that means? No, I'm just refining what, that was not disputed, Your Honor. I believe in, and I don't, I can't, I looked while I was at the table and I couldn't just immediately get to that point or the site. But, it was clear that they were relying only on 3M prices. There was data provided by the VA of the prices that were paid to the other 219 vendors that the VA purchased for. And there's a wide disparity in what those are. But there was no analysis in that regard presented to the court by the government of what that figure would have been. And that's our position, and I think it's Dr. Noll's position, is the market for secondary wholesalers was completely different than the 3M market, pre and during the pandemic. Is there any evidence, I'm not, did you, is there any evidence in this record of what the prices properly in that market were, which was one of my questions earlier. I'm not challenging guilt or innocence here, and neither are you. But it does seem to me, if a market like this cannot legally exist, that's a significant matter. So, were there people doing what was considered legitimate in the same way your client was doing, and do we have any figures on what that is? Your Honor, there are figures in the record. I don't have them synthesized in a way that I could, would be in any way. You're speaking from the podium now, but are they in this record of what other people were doing at a price that did not end up in court? The raw data is in the record. And I can't speak to the government's exercise of its discretion about why one person was prosecuted over another, and it's largely irrelevant to what we do. But that's essentially where we are. But they are in the record that they were not synthesized in that way. And Dr. Noll's opinion was that what is most reflective of the fair market value is what these willing buyers at the time were willing to pay the seller to purchase the mask in the context that we've already talked about. The other thing I wanted to try and get to, if it's okay, is if you look at the pre-sentence report, some of the things that my colleague discussed about being a benefit, well, you know, the pre-sentence report didn't use non-mask PPE at private hospitals. That's because the government didn't come forward with that evidence. So, that's not a benefit. I mean, it may ultimately inure to Mr. Ritchie's benefit, but the government didn't put that forward. And so, to sort of stand here and say, well, we did you a favor, so stop complaining, is a little bit rough. The other issue is the pre-sentence report, if you'll notice, for the VA hospitals. Counsel? I'm out of time, Your Honor. I'm sorry. All right. Thank you. It was a pleasure to be here today. Thank you both for your explanations of this case this morning. We'll take it under advisement.